INDEPENDENT COMMUNITY BANK-ERS ASSOCIATION OF SOUTH DAKOTA, INC., Petitioner,

v.

BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent,

Michigan National Corporation, Intervenor.

No. 86–5373.

United States Court of Appeals, Eighth Circuit.

Submitted May 11, 1987.

Decided Jan. 28, 1988.

R.G. Schmidt, Pierre, S.D., for petitioner.

James E. Scott, Washington, D.C., for respondent.

Before HEANEY and BOWMAN, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.

HEANEY, Circuit Judge.

Independent Community Bankers Association of South Dakota, Inc. (ICBA) seeks review of an order of the Board of Governors of the Federal Reserve System (Board). This order approved the application of Michigan National Corporation (MNC) to establish and acquire the shares of a new national bank in Rapid City, South Dakota. We reverse the decision of the Board.

**I**

MNC is a bank holding company as defined in the Bank Holding Company Act of 1956, 12 U.S.C. §§ 1841–48, with some twenty subsidiary banks in Michigan and 6.1 billion dollars in domestic deposits. On June 9, 1986, it submitted an application to the Board to establish and acquire a national bank in Rapid City pursuant to 12 U.S.C. § 1842. In its application, MNC stated that it sought to acquire the bank in order to transfer its consumer credit card operations to South Dakota. In passing upon the application, the Board assumed that the transfer was motivated by MNC's desire to take advantage of the fact that South Dakota had repealed its usury statute.[1]

Central to the Board's approval of the application was its interpretation of section 3(d) of the Bank Holding Company Act, 12 U.S.C. § 1842(d). The section, commonly known as the "Douglas Amendment", allows the Board to approve an application by an out-of-state bank holding company to acquire a bank located outside of the state in which it principally conducts its operations. The Board may approve such an acquisition only if the law of the state in which the acquired bank is located specifically authorizes such acquisitions.[2]

In 1980, South Dakota enacted legislation to provide the authorization required by the Douglas Amendment.[3] The authorization,

1. Under the Supreme Court's decision in *Marquette National Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978), the interest rate a bank may charge on credit card loans is regulated by the law of the state in which the bank is located regardless of residence of the cardholder. Thus, by moving its credit card operations to South Dakota, the interest rate MNC may charge on its credit card loans will be essentially unregulated.

2. The section states:
   Notwithstanding any other provision of this section, no application * * * shall be approved under this section which will permit any bank holding company or any subsidiary thereof to acquire, directly or indirectly, any voting shares of, interest in, or all or substantially all of the assets of any additional bank located outside of the State in which the operations of such bank holding company's bank-

ing subsidiaries were principally conducted on July 1, 1966, or the date on which such company became a bank holding company, whichever is later, unless the acquisition of such shares or assets of a State bank by a bank holding company is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication. For the purposes of this section, the State in which the operations of a bank holding company's subsidiaries are principally conducted is that State in which total deposits of all such banking subsidiaries are largest.
   12 U.S.C. § 1842(d).

3. S.D. Codified Laws Ann. § 51–16–40 states:
   Subject to the provisions of this chapter and to the approval of the banking commission, a bank holding company, as defined in the Bank Holding Company Act of 1956, as

however, is not an unrestricted invitation to do business. New banks acquired by out-of-state bank holding companies are limited to one office. This office is to be located and operated in "a manner not likely to attract customers from the general public in the state to the substantial detriment of existing banks in the state." S.D. Codified Laws Ann. § 51–16–41.[4] In addition, an acquisition authorized by the statute must be approved by the South Dakota Banking Commission, "subject to such conditions as the commission deems necessary, and to the commission's continuing authority to ascertain the bank holding company's compliance with the [authorizing statute] and the conditions of approval." S.D. Codified Laws Ann. § 51–16–42.[5]

In an order dated September 15, 1986, the Board approved MNC's application to acquire the new South Dakota bank. In doing so, the Board rejected objections raised by ICBA that the Douglas Amendment does not authorize states to permit out-of-state bank holding companies to acquire national banks. Alternatively, ICBA

argued that even if the amendment authorizes states to permit such acquisitions, it does not allow them to condition permission on compliance with state regulation by the acquired bank. ICBA raises these arguments on appeal.

## II

■ ICBA contends that the Douglas Amendment does not authorize a state to permit an out-of-state bank holding company to acquire a national bank. We disagree. In *Independent Community Bankers Association of South Dakota, Inc. v. Board of Governors of the Federal Reserve System*, 820 F.2d 428 (D.C.Cir. 1987), a case involving an identical factual situation, the Court of Appeals for the District of Columbia examined the Douglas Amendment and its legislative history. It found that the amendment contains two operative provisions. The first absolutely prohibits the Board from approving the acquisition of any additional bank, state or national, located outside of the home state

amended, 12 U.S.C. Sec. 1841, et seq., the principal place of business of whose banking subsidiaries is located outside the state,

(a) May acquire all or substantially all of the shares of a single new bank which is established under the laws of this state and which has minimum total capital of five million dollars and a single new national bank which is to be located in this state and which has minimum total capital of five million dollars, and;

(b) May acquire all or substantially all of the shares of a single existing bank which is established under the laws of this state.

The acquisition of any bank by a corporation that is not a bank holding company is subject to the approval of the state banking commission pursuant to § 51–16–42.

4. The statute states in relevant part:

Any bank the shares of which are acquired under the authority of [the authorizing statute] shall be limited to a single banking office and such bank may not acquire, establish, share or maintain any additional banking office or remote service unit whether by merger, consolidation or otherwise. In the case of a new bank, the shares of which are acquired under the authority of [the authorizing statute] such single banking office shall be operated in a manner and at a location which is not likely to attract customers from the gener-

al public in the state to the substantial detriment of existing banks in the state.

MNC has indicated that it will comply with the dictates of the South Dakota statute. In *response to a request for additional information* by a senior examiner of the Federal Reserve Bank of Chicago, MNC stated:

The proposed Bank will be located at 430 Main Street, Rapid City, South Dakota, which as a location is not likely to attract the general public to the substantial detriment of existing banks. * * *

It is our intention to make it relatively inconvenient for customers to transact traditional banking services with the Bank. For instance, the teller windows for the banking organization will be located in the basement of the building. Recently, the South Dakota Banking Commission found in its approval for the acquisition by Michigan National Corporation of Independence One Bank, National Association, that the banking office of the Bank is not likely to attract the general public to such substantial detriment of the existing bank.

Designated Record at 92.

5. On April 23, 1986, MNC submitted a proposal to the South Dakota Banking Commission. On June 16, 1986, the Commission issued a decision concluding that MNC's proposal met the requirements for approval set forth in the relevant South Dakota statutes.

of the applicant bank holding company. *Id.* at 433. This provision reads:

> [N]o application shall be approved under this section which will permit any bank holding company or any subsidiary thereof to acquire, directly or indirectly, any voting shares of, interest in, or all or substantially all of the assets of any additional bank located outside of the State in which the operations of such bank holding company's banking subsidiaries were principally conducted on July 1, 1966, or the date on which such company became a bank holding company whichever is later[.]

12 U.S.C. § 1842(d).

The Court found that the remainder of the provision modifies the first part of the section. This provision states:

> [U]nless the acquisition of such shares or assets of a State bank by an out-of-State bank holding company is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication.

*Id.*

ICBA argued to the Court of Appeals for the District of Columbia and argues to this Court that the latter clause provides an exception to the first that, by its terms, is applicable only to state banks and not to national banks. In contrast, the Board contends that authorization under the second clause completely suspends the operation of the first. That is, if a state permits interstate bank acquisitions of state chartered banks, the lifting of the first clause's prohibition provides for similar treatment for national banks.

With respect to this issue the D.C. Circuit stated:

> The plain meaning of the Amendment in its entirety supports the Board's reading. By its terms, the first clause of the Amendment prohibits the interstate acquisition of both state and national banks. The second clause provides the carte blanche prohibition stands *unless* the state permits the interstate acquisition of "such shares or assets of a State bank." The ordinary meaning of this language compels the conclusion that the entire prohibition lifts upon the state's authorization of interstate acquisition of a "State bank" located within its borders. The "unless" clause describes the triggering event that lifts the general prohibition with respect to all banks—"any additional bank"—located in the state. The Douglas Amendment need not specifically mention "national bank" in order to have this effect. Nor need the state specifically authorize the acquisition of national banks. In fact, the Douglas Amendment renders superfluous a state statute's authorization of interstate acquisitions of nationally chartered banks located in the state. Such state "authorization" would, in any event, be meaningless. Bank holding companies and nationally chartered banks are organized pursuant to federal law and the power of either to acquire or be acquired is governed by federal law.

*Independent Community Bankers Association of South Dakota, Inc.,* 820 F.2d at 433–34 (emphasis in original).

In addition, the D.C. Circuit examined the legislative history of the Douglas Amendment and found that it, like the McFadden Act, 12 U.S.C. § 36, which served as a model, sought to ensure that national banks would be treated on a par with state banks with respect to acquisitions by out-of-state bank holding companies. *Id.* at 435.

We agree with the D.C. Circuit and hold that "the Douglas Amendment permits the approval of an out-of-state bank holding company's acquisition of an in-state national bank if the state in which the national bank is located has authorized the interstate acquisition of local state chartered banks." *Id.*

### III

Alternatively, ICBA argues that even if South Dakota may permit acquisition of local banks (either state or national) by out-of-state bank holding companies, it may not condition the permission on compliance with state regulations limiting the banking

activities of the acquired local bank.[6] We agree.

The Board argues that South Dakota's regulation of the activities of a bank acquired by an out-of-state bank holding company is permissible because Congress, through the Douglas Amendment, has either expressly incorporated the South Dakota restrictions into the federal law or has authorized them. Specifically, the Board contends that the authority given the states to lift the federal prohibition of interstate acquisitions found in the latter clause of the Douglas Amendment necessarily gives states the authority to enact statutes conditioning permission on restriction of the operations of the acquired banks.

In support of its position, the Board cites *Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System*, 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985). In *Northeast*, the Supreme Court considered a state Douglas Amendment statute authorizing local banks (state and national) to be acquired by out-of-state bank holding companies provided the out-of-state bank holding company is located within a defined region and provided the state in which the holding company is located has passed a reciprocal authorizing provision. The Court held that the Douglas Amendment contains implicit authority for states to permit acquisitions on a limited or conditional basis. As the Court stated, "Congress contemplated that some States might partially lift the ban on interstate banking without opening themselves up to interstate banking from everywhere in the nation." *Id.* at 172, 105 S.Ct. at 2553, 86 L.Ed.2d at 124.

It is important to note, however, that *Northeast* did not involve the issue of a

state's ability to restrict the activities of an acquired bank once it has been given permission to do business in the state. In other words, although the Court determined that Congress intended to give states flexibility in determining whether to allow interstate acquisitions, it did not address the question of restrictions on the activities of acquired banks as a condition of permission to do business.

In contrast, in *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980), the Supreme Court struck down a Florida statute prohibiting out-of-state bank holding companies from engaging in certain non-bank activities. In so holding, the Court rejected the state's argument that its statute was authorized by the Douglas Amendment. It stated:

> We conclude that § 3(d) offers scant support for the portions of [the Florida statute] subject to challenge in this proceeding. Preliminary [sic] it is doubtful that § 3(d) authorizes state restrictions of any nature on bank holding company activities. The language of the statute establishes a general federal prohibition on the acquisition or expansion of banking subsidiaries across state lines. The only authority granted to the States is the authority to create exceptions to this general prohibition, that is, to permit expansion of banking across state lines where it otherwise would be federally prohibited. Furthermore, the structure of the Act reveals that § 3(d) applies only to holding company acquisitions of banks. Nonbanking activities are regulated separately in § 4, which does not contain a parallel provision.

*Id.* 447 U.S. at 47, 100 S.Ct. at 2021.[7]

Additionally, the D.C. Circuit has expressly addressed the restrictions imposed

---

**6.** In this appeal, ICBA challenges the Board's construction of the Douglas Amendment as authorizing state statutes that condition the specific state permission required by the Douglas Amendment on compliance by acquired banks with state imposed restrictions on their activities. ICBA argues that such a construction is contrary to federal law. Since, as the Board recognizes, the immunity of the South Dakota authorizing statute from attack as violative of the dormant Commerce Clause of the United

States Constitution in large part turns upon the authority given states to pass such statutes by the Douglas Amendment, we requested and received supplemental briefs from the parties on the issue.

**7.** The Board suggests that statements in *Lewis* regarding § 3(d), 12 U.S.C. § 1842(d), are inapposite because the case dealt with restrictions on the in-state non-banking activities of out-of-state bank holding companies which are ex-

by the South Dakota statute on the activities of banks acquired by out-of-state bank holding companies. The Court stated:

> We can locate no grounds for declaring that the Douglas Amendment authorizes state regulation of the operations of national banks acquired pursuant to the state's "Douglas Amendment" statutes. Neither the Douglas Amendment nor its legislative history speaks to this question, and no court has broached the issue. The Board's notion of congressional authorization returns us to the nettlesome problem posed by the potential conflict between state-imposed conditions and federal banking law. If we find that Congress granted the states the authority to impose conditions on national banks, then the effect will be to nullify federal banking laws and to regulate an increasing number of national banks in a manner that is repugnant to federal policies. In other words, the Douglas Amendment would operate as an implied statutory repeal of many important federal banking laws. * * * "It is ... a cardinal principle of statutory construction that repeals by implication are not favored." Generally, courts will not find repeals by implication unless legislative intent to repeal is "clear and manifest." Neither the language of the Amendment nor its legislative history indicates an intention to abrogate extant federal banking law governing bank holding companies and their subsidiary nationally chartered banks. We therefore decline to hold that Congress created, through the Douglas Amendment, the specific authority for South Dakota to impose restrictions on national banks.

*Independent Community Bankers Association of South Dakota, Inc.,* 820 F.2d at 438 (citations omitted).

■ We agree with the D.C. Circuit that the Douglas Amendment neither incorporates nor authorizes the South Dakota statute restricting the operations of acquired national banks. Thus, if the South Dakota

statute is to survive scrutiny, it must be within the authority of the state to enact.

The Board contends that even in the absence of congressional authority, South Dakota may regulate the operations of acquired banks so long as the regulation is not contrary to federal law. We note that prior to passage of the Douglas Amendment, states enjoyed some power to regulate national banks. *See Davis v. Elmira Savings Bank,* 161 U.S. 275, 278, 16 S.Ct. 502, 503, 40 L.Ed. 700 (1896) ("It is certain that, insofar as not repugnant to acts of Congress, the contracts and dealings of national banks are left subject to the state law"); *Independent Community Bankers of South Dakota,* 820 F.2d at 438. Yet as the Supreme Court has stated:

> National banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt by a state to define their duties or control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation, or impairs the efficiency of these agencies of the Federal government to discharge the duties for the performance of which they were created.

*Davis,* 161 U.S. at 283, 16 S.Ct. at 503.

■ We agree with the D.C. Circuit that even in considering purely legal issues, courts should grant great deference to the reasonable interpretations of statutes by the agencies charged with administering those statutes. *See Independent Community Bankers of South Dakota, Inc.,* 820 F.2d at 439, *see also Board of Governors of the Federal Reserve System v. Investment Company Institute,* 450 U.S. 46, 56–57, 101 S.Ct. 973, 981–82, 67 L.Ed.2d 36 (1981). This is particularly true if the interpretation involves a technical area that

---

pressly regulated by § 4 of the Act, 12 U.S.C. § 1843. While the case could have been decided on the ground that § 4 of the Act does not authorize the restrictions imposed by the state

statute, we do not read it so narrowly. Rather, the case expresses alternative positions either one of which could provide a rationale for the decision in the case.

is highly specialized and requires coordinated management in all its phases. *Investment Company Institute*, 450 U.S. at 56 n. 21, 101 S.Ct. at 982 n. 21.[8]

In finding that the proposed acquisition is authorized by state law the Board cited three sources for support. First, it found that the South Dakota Banking Commission concluded that the proposed acquisition met the requirements of the South Dakota statute. Second, it relied on its prior decision in *First City Bancorporation of Texas, Inc.*, 71 Federal Reserve Bulletin 716 (1985). Finally, it cited a July 31, 1986 letter of the Comptroller stating, "to date, the South Dakota law has not required that national banks restrict their activities in a manner which is unsafe or unsound or otherwise in conflict with the purposes of the National Bank Act." [9] Each of these authorities presumes that the South Dakota authorizing statute is a valid exercise of state power. Indeed in a prior decision, the Board considered whether the South Dakota authorizing statute is consistent with the Commerce Clause and presumed it valid on its face. *Citicorp*, 67 Federal Reserve Bulletin 181 n. 4 (1981).

Thus, it appears that in this case the Board presumed the limitations on the activities of the acquired bank are authorized by the Douglas Amendment and presumed they are consistent with the Commerce Clause. *Cf. Iowa Independent Bankers v. Board of Governors of the Federal Reserve System*, 511 F.2d 1288, 1293 n. 4 (D.C.Cir.1975) ("we feel constrained to register our substantial doubt that the Board can continue to presume conclusively the constitutional validity of state or federal laws in light of the Supreme Court's opinion in *Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965)").

More importantly, the Board's finding, insofar as it is based on the constitutional validity of the South Dakota authorizing statute, is subject to de novo review by this Court. Thus, although this Court should grant great deference to the Board's interpretation of national banking law, *Board of Governors of the Federal Reserve System v. Investment Company Institute*, 450 U.S. 46, 56–57, 101 S.Ct. 973, 981–82, 67 L.Ed.2d 36 (1981), that deference should not deter us from correcting the Board when its decision rests on an erroneous presumption concerning the resolution of an important constitutional issue.

The crux of this case is that South Dakota seeks to provide its citizens with the jobs and benefits a large national credit card operation can provide (attracted by the ability to export limitless credit card interest rates to other states) while protecting its local banks (both state and national) from the competition such national credit card banks could pose. In this regard, the *Lewis* case is instructive. In *Lewis*, the Court found that the statute at issue was "parochial" in the sense that it prevented "out-of-state firms with the kinds of resources and business interests that make them likely to attempt de novo entry" from competing in local markets. *Lewis*, 447 U.S. at 39, 100 S.Ct. at 2017. The Court went on to state:

8. In recognition of the Board's expertise, Congress, under 12 U.S.C. § 1842(a), has given the Board exclusive original jurisdiction to pass upon a proposed acquisition of a bank (existing or newly formed) by a bank holding company. *See, e.g., Whitney National Bank v. Bank of New Orleans and Trust Company*, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965). If the acquired or acquiring bank is to be a national banking institution, the Board must also notify the Comptroller and consider its views and recommendations. 12 U.S.C. § 1842(b). Finally, in addition to other considerations not here relevant, the Board may not approve the acquisition of a bank by an out-of-state bank holding company unless the acquisition is authorized by the law of the acquired bank's state. 12 U.S.C. § 1842(d) (the Douglas Amendment).

9. The Board also argues to this Court that it is entitled to give weight to prior rulings of the Comptroller of the Currency which have routinely approved the charter of national "credit card" banks under state statutes similar to South Dakota's and have found that such statutes do not violate national banking law. *See, e.g., First Kentucky National Corp.*, 70 Fed. Res. Bull. 434 (1984); *Provident National Corp.*, 68 Fed. Res. Bull. 260 (1982); *Citicorp*, 67 Fed. Res. Bull. 181 (1981).

With regard to the asserted interest in promoting local control over financial institutions, ... [i]n almost any Commerce Clause case it would be possible for a State to argue that it has an interest in bolstering local ownership, or wealth, or control of business enterprise. Yet these arguments are at odds with the general principle that the Commerce Clause prohibits a State from using its regulatory power to protect its own citizens from outside competition.

*Lewis*, 447 U.S. at 44, 100 S.Ct. at 2019 (citations omitted).

■ In short, the Court found that it did not have to determine whether the Florida statute at issue was invalid as a per se violation of the Commerce Clause because it "discriminates among affected businesses according to the extent of their contacts with the local economy," *id.*, 447 U.S. at 42, 100 S.Ct. at 2018, or whether, under the more permissive test, the statute could not be justified because, "the disparate treatment of out-of-state bank holding companies cannot be justified as an incidental burden necessitated by legitimate local concerns." *Id.* We likewise find that the South Dakota statute here at issue fails under either standard because the restrictions it imposes on an out-of-state bank holding company's ability to compete in local markets are precisely the type of "parochial" regulations the Commerce Clause prohibits.[10]

In addition, the legislative history of the Douglas Amendment leads to a conclusion consistent with the Commerce Clause analysis. In pointing out the analogy between his amendment and the McFadden Act, 12 U.S.C. § 36(c), Senator Douglas stated during the floor debate:

[W]hat our amendment aims to do is to is to carry over into the field of holding companies the same provisions which already apply for branch banking under the McFadden Act—namely, our amendment will permit out-of-State holding companies to acquire banks in other States only to the degree that State laws expressly permit them; and that is the provision of the McFadden Act.

102 Cong. Rec. 6860 (1956) (remarks of Senator Douglas).

Thus, both the McFadden Act and the Douglas Amendment represented a compromise between federal and state interests in banking regulation. Under the terms of the compromise, states would remain free to regulate local banks with respect to acquisition by holding companies and branch banking, but federal law would require all banks within the state to be in a position of competitive equality whether they have been acquired by a local or out-of-state bank holding company or whether the acquired bank is state or federal. *Cf. First National Bank v. Walker Bank & Trust Co.*, 385 U.S. 252, 258, 87 S.Ct. 492, 496, 17 L.Ed.2d 343 (1966) (national banks subject to the same branching restrictions as state banks). Such competitive equality is consistent with the dictates of the Commerce Clause.

■ Thus, we hold, as the Supreme Court did in the context of section 7 of the Bank Holding Company Act, that the Douglas Amendment only permits States to enact authorizing statutes that fall within

---

**10.** Indeed, to hold otherwise could well lead to parochial state legislation even more onerous than that at issue in this case. For example, Delaware has enacted a statute similar to South Dakota's with the exception that it contains an additional requirement. The Delaware statute authorizes an acquisition only if:

The bank whose stock is to be acquired employs on the date of commencement of its banking business in this State or will employ within 1 year of such date not less than 100 persons in this State in its business and, if the stock of a second bank is acquired, that bank, together with its "affiliates" as that term is defined in subchapter V of this title, will employ within 1 year of its commencement of business in this State at least 200 persons within the State."

In sum, there must be a limit to the restrictions a state may place on the activities of an acquired bank. As the Supreme Court stated: [T]here [can be no] serious question that an individual state acting entirely on its own authority would run afoul of the dormant Commerce Clause if it sought to comprehensively regulate acquisitions of local banks by out-of-state holding companies.

*Northeast Bancorp*, 472 U.S. at 174, 105 S.Ct. at 2554, 86 L.Ed.2d at 125.

the boundaries of the Commerce Clause. *See Lewis*, 447 U.S. at 49, 100 S.Ct. at 2022. Since the South Dakota statute here at issue falls outside of the boundaries of the Commerce Clause, any interpretation of federal banking law by the Board or the Comptroller of the Currency allowing approval of an application pursuant to such a state statute is unreasonable. Accordingly, we reverse the decision of the Board approving MNC's application and remand to the Board with directions to withhold approval until such time as the State of South Dakota may modify its authorizing statute so as to bring it into conformity with federal law.[11]

BOWMAN, Circuit Judge, dissenting.

I respectfully dissent from Part III of the Court's opinion. Here, just as in *Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System*, 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985), "the commerce power of Congress is not dormant, but has been exercised by that body when it enacted the Bank Holding Company Act and the Douglas Amendment to the Act." *Id.* at 174, 105 S.Ct. at 2554. In *Northeast Bancorp*, the Supreme Court observed that the Douglas Amendment explicitly bans the interstate acquisition of banks by bank holding companies, *id.* at 168, 105 S.Ct. at 2550, but that it "plainly permits States to lift the federal ban entirely." *Id.* at 169, 105 S.Ct. at 2551. The Court held that States may exercise their authority under the Douglas Act not only by lifting the federal ban entirely, but also by lifting it only partially. After considering both the language and the legislative history of the Douglas Amendment, the Court specifically rejected the view "that a State is allowed only two alternatives: leave the federal ban in place or lift it completely." *Id.* "[T]here can be no other conclusion but that Congress contemplated that some States might partially lift the ban on interstate banking without opening themselves up to interstate banking from everywhere in the Nation." *Id.* at 172, 105 S.Ct. at 2553.

Based on my reading of *Northeast Bancorp*, I believe that the Douglas Amendment authorizes South Dakota's partial lifting of the federal ban against the acquisition of local banks by out-of-state bank holding companies. I am unable to perceive a principled legal distinction between the entry restrictions at issue in this case and the entry restrictions that the Supreme Court upheld in *Northeast Bancorp*. State actions that Congress has authorized "are invulnerable to constitutional attack under the Commerce Clause." *Id.* at 174, 105 S.Ct. at 2554 (citations omitted). I therefore would affirm the order of the Board.

---

**11.** Pursuant to 12 U.S.C. § 1848 the Court may, "affirm, set aside, or modify the order of the Board, and ... require the Board to take such action with regard to the matter under review as the court deems proper."